SAMUEL N. BACON, APPELLANT, v. THE UNITED STATES MUTUAL ACCIDENT ASSOCIATION OF THE CITY OF NEW YORK, RESPONDENT.

*Insurance against injuries from " external, violent and accidental means" — construction of these words when used in a policy.*

Upon the application of one Oaks the defendant corporation issued to him an accident insurance policy by which it agreed to pay to his mother a sum, not exceeding $5,000, within sixty days after sufficient proof "that said member, at any time within the continuance of membership, shall have sustained bodily injury effected *through external, violent* and *accidental means,* within the intent and meaning of the by-laws of said association," provided "that benefits under this certificate shall not extend to any bodily injury of which there shall be no external or visible signs, * * * nor to any death or disability which may have been caused wholly or in part * * * by *poison* in any manner or form."

Upon the trial of this action, brought by the plaintiff, as the assignee of the policy, to recover the amount so agreed to be paid, it was proved that the deceased, who had formerly lived in Massachusetts, went, in the early part of February, 1884, to Council Bluffs, Iowa, and there worked in a meat market and a freight office, where hides and cattle were received, until he died, on March twenty-first, from malignant pustule. The *uncontradicted testimony of a physician,* as given upon the trial, showed that the cause of the death of the deceased was the infliction upon a portion of his body of a putrid animal substance which, working through the system, caused him to die from affections of the different internal organs of the body; that this produced what is called in medicine malignant pustule, and that that disease was invariably produced by the infliction of animal substance upon the body, and was usually communicated from the skins or bodies of animals which were suffering from that disease, which is found in their hair.

*Held,* that the word "poison" in the certificate, and in the application upon which it was issued, was used in its ordinary meaning of a substance taken internally, seriously injurious to health and often fatal to life.

That it was established by the evidence that his death was caused by external, violent and accidental means.

That the court erred in directing a verdict for the defendant.

APPEAL from a judgment dismissing the complaint entered upon an order made on the trial of this action at circuit.

The plaintiff brings this action as assignee of an accident insurance policy issued by the defendant to Frederick J. Oaks. The complaint alleged the incorporation of the defendant, the issuing of the policy alleging its conditions; the sustaining of bodily

injury by the assured, of which he died; the assignment of the policy to the plaintiff; the making of proof of death and demand of payment.

The answer admitted the incorporation of the defendant; alleges the application by said Oaks for certificate of membership under the conditions prescribed by the rules and by-laws of the association; the payment of the fee for membership and the issuing of the certificate of membership or policy, with reference to the conditions thereof, and a denial of any knowledge or information sufficient to form a belief of the other facts alleged in the com plaint. On the trial the plaintiff offered and read in evidence the policy of accident insurance issued by the defendant upon the life and person of Frederick J. Oaks, dated September 28, 1883, amount to be paid to Mary Jane Oaks. The policy contained this provision: " The principal sum represented by the payment of two dollars by each member in division ' A. A.' of the association, as provided in the by-laws (which sum, however, is not to exceed five thousand dollars), to be paid to Mary Jane Oaks (his mother), if surviving (in the event of prior death of said beneficiary, or any of them, said sum shall be paid as provided in the by-laws), within sixty days after sufficient proof that said member, at any time within the continuance of membership, shall have sustained bodily injuries, effected through external, violent and accidental means, within the intent and meaning of the by-laws of said association and the conditions hereunto annexed, and said injuries alone shall have occasioned death within ninety days from the happening thereof.' " The policy also contained a proviso " that benefits under this certificate shall not extend to hernia nor to any bodily injury of which there shall be no external or visible signs, * * * nor to any death or disability which may have been caused, wholly or in part, by bodily infirmities or disease, existing prior or subsequent to the date of this certificate, or by poison in any manner or form."

In the application the assured signed an acknowledgment that the policy did not extend to death or injury * * * caused wholly or in part by taking of poison in any form or manner. The plaintiff also put in evidence the assignment of the certificate from Mary Jane Oaks to the plaintiff. Also the proof of death of

Fredrick J. Oaks at Council Bluffs, Iowa, on the 21st day of March, 1884. The proof showed that Council Bluffs was a place where cattle and hides were extensively shipped, and that about the time of his death, Frederick J. Oaks, worked at Council Bluffs in a meat market and in the freight office of the Union Pacific Railroad at that place." The plaintiff then proved by a medical expert that he made a *post mortem* examination of Fredrick J. Oaks and ascertained that the cause of his death was the infliction upon a portion of his body of a putrid animal substance which working through the system caused him to die from affections of the different internal organs of the body ; * * * the name of the manifestation of that infliction is known in medicine as malignant pustule ; it is produced invaribly by the infliction of animal substance upon the body  The witness further testified that this was caused by an accidental deposit of this material there, and is usually communicated from the skins or bodies of animals which are suffering from this peculiar disease found in their hair.  After stating various methods by which this virus may be communicated, the witness stated, that it produced blood poisoning and when produced he stated that the practical effect of blood poisoning is the same from whatever cause produced  Witness also stated, that as to the method in which this charbon virus became implanted upon this young man's lip, he could not say.  The plaintiff also put in evidence a letter from the company, declining to pay on the ground that there was no valid claim under the certificate of membership, claiming that deceased died from septiemia from carbuncle of the lower lip. It was admitted that the defendant sent out the printed blank for the application for membership.

Upon the evidence the defendant asked the court to direct a verdict for the defendant on the ground that it appeared from the pleadings that death was produced from a cause not covered by the policy, and that the proof does not warrant a verdict for the plaintiff  The plaintiff's counsel objected and asked the court to allow the plaintiff to go to the jury on all the evidence in the case.  The plaintiff's counsel also asked the court to direct a verdict of $5,000 for the plaintiff, which the court refused, and directed a verdict for the defendant, on which judgment was entered and the plaintiff appeals to this court.

*Steadman, Thompson & Andrews*, for the appellant.

*Wm. Bro. Smith*, for the respondent.

LEARNED, P. J.:

In the application the insured stated that he was aware that the benefits "will not extend   *   *   *   to death or disability caused wholly or in part   *   *   *   by taking of poison in any form or manner." In the certificate the corresponding phrase is that benefits "shall not extend   *   *   *   to any death or disability which may have been caused wholly or in part   *   *   *   by poison in any manner or form."

The application refers to the certificate. The certificate to the application. The two explain each other; and show that the word "poison" therein is used in its ordinary meaning, of a substance taken internally, seriously injurious to health and often fatal to life. The word "taking" is omitted in the certificate, but not for any change of meaning. "Death by poison" is well understood in ordinary language. It is a phrase which would never be applied to death from a rattle-snake's bite, although that injects into the circulation what may be called a poison. In certain cases death comes from what is called "blood poisoning." One who dies from a bullet wound may die of "blood poisoning;" but he does not die by poison in the ordinary sense of the word. The insured died from what is known as malignant pustule. This is produced invariably, according to the testimony, "by the infliction of animal substances upon the body;" by the accidental deposit of this putrid and poisonous animal substance. This is usually communicated from the bodies, or skins, or hides, of animals which are suffering with this peculiar kind of disease.

The substance may be carried by flies that have been feeding upon it. The disease may come by the application of the person himself, of his hand, which has been in contact with this substance to some abraded surface of his body. And the substance may be absorbed by the thin portions of the lips though they are not abraded. Thus it appears that the cause of death in this case was a disease produced by the touching of an abraded part of the thin part of the lips, with a putrid animal substance.

The question, then, is whether the deceased "sustained bodily

injuries effected through external, violent or accidental means," and whether such injuries alone occasioned death within ninety days from the happening thereof. The deceased had lived in Southbridge, Mass. The early part of February, 1884, he went to Council Bluffs, Iowa. There he worked in a meat market and in a railroad freight office, a place where hides and cattle were received to a considerable extent. He died there March twenty-first. There were on his body, upon his lip, external indications of the pustule, which is the beginning point of the disease Thus, there was proof that there was an " external and visible " sign of the injury. The defendants, in their correspondence, insisted that they were not liable because the deceased died from a carbuncle, the result of disease. This they said they had ascertained at the place of his death. And they further claimed that, even if the disease was malignant pustule, "malignant pustules arise from various causes not accidental." Thus they took the position that, whatever the disease, the cause was not external or accidental. If that were so, they would not be liable. But the positive testimony of the physician on the trial, not contradicted, shows that the death was not from carbuncle, the result of disease, but from malignant pustule, as above stated; and the evidence was sufficient to go to the jury upon the point that the cause arose within the ninety days prior to death.

The means through which deceased came to his death were external. The positive testimony of the physician shows this. The putrid animal substance reached the body, not through the stomach or the lungs, but through the skin, the external covering. The cause was external as much as the crushing under a car or the bite of a rattlesnake would have been. (*Hill* v. *Hart. Acc. Ins. Co.*, 22 Hun, 187.) Next, were the means accidental? They cannot be thought otherwise. It is too improbable to suppose that the deceased intentionally put his hand, infected with putrid meat, upon his lip in order to produce death. If he had intended to commit suicide, this would not have been the mode selected. By whatever direct means the putrid substance was brought into contact with his face, the contact must have been accidental. (*Mallory* v *Trav. Ins. Co.*, 47 N. Y , 53 ; *Insurance Co.* v. *Burroughs*, 69 Penn. St., 43.) The most difficult and perplexing point remains were the means violent?

Suppose the fact to have been that an insect which had been feeding on the putrid meat afterwards alighted on the deceased's face, and even pierced the skin ; was this violent ? Or suppose the fact to have been that the deceased himself placed his own hand, infected with this putridity, on his face; was this violent ? It may help us to understand the meaning put in this word " violent " by the defendants, if we examine some of the exceptions made by them. The certificate says that no claim can be made when death has been caused by lifting, over-exertion, sunstroke or freezing. Now, as these are made exceptions, it is reasonable to understand that, without special exception, they would have been within the language " violent " means. Yet sunstroke and freezing do not import physical violence any more than does drowning. (*Trew* v. *Ins. Co.*, 6 H. & N., 845.) We say a man dies a violent death, without necessarily implying anything more than that he dies, not in the ordinary course of nature and disease. If by violent is meant physically violent or forcible, then how great must be the force ? Is it not enough, however small it be, if it produces death or bodily injury ? A poisoned arrow may make a small wound, but if it produces death, is not that a death by violent means ? A rattlesnake bite may be hardly perceptible. It is hardly possible that this certificate is to be considered as insuring against death from great violence, and not against death from a slight blow. There is an exception in this certificate of " self-inflicted " injuries, but that must mean intentionally self-inflicted. It cannot be a self-inflicted injury when one accidentally stumbles and falls down stairs, breaking his leg. So that, even if this pustule came by the contact of the deceased's own hand, yet it could not justly be called a self-inflicted injury.

The case of *Searles* v. *Manhattan Elevated Railway Company* (101 N. Y., 661) was one where the accident might have been occasioned by either one of two causes, a cinder from the smoke-stack or one from the ash-pan. For the former the defendant would not be liable, for the latter they might. In the lack of evidence, as to which is the real cause, defendants would not be held liable. But there is no uncertainty in this present case. There was no dispute as to the cause of death. Plaintiff had another witness, but the court did not care to hear any more.

The defendants urge as a defense that, in the preliminary proofs

of death, the cause of death was given as "a small pimple on face became anthrax." But if this were incorrect, it was in no way binding on the plaintiff. The real cause was unquestionably proved at the trial, and the question here must be decided on the undisputed facts testified to by the physician. Indeed, while the preliminary proofs are not full as to the cause which produced the pimple, they are not inconsistent with the testimony on the trial; and the cause of the pimple having been proved on the trial, the question is fairly before us whether that cause is within the meaning of the certificate And in deciding this, we think that the defendants, in their correspondence, showed a correct view of the general principles when they said that the death was not by accident, but by disease. That must generally be the distinction. This is an accident policy. If the deceased died from disease, as distinguished from accident, plaintiff cannot recover. If deceased died from accident, as distinguished from disease, he can. Now, undoubtedly, accidents and external injuries often produce death through the disorganization of internal organs; still, the accident is the cause. On the other hand, it is said that impure water taken into the stomach, or impure air into the lungs, cause fever. But these fevers are diseases, having their origin internally. They are not the results of accidents. But in this case there is just what the defendants evidently believed there was not, an external and accidental cause, and not an internal disease manifesting itself externally. Guided by this general view of the deaths and injuries against which the certificate was intended to insure, we think that this plaintiff should not have been nonsuited.

Judgment reversed, motion granted, costs to abide event.

LANDON and MAYHAM, JJ., concurred.

MAYHAM, J.:

Two questions are raised and principally relied upon by the appellant on this appeal:

*First.* Whether the causes which produce malignant pastule, as shown by the undisputed evidence of Dr. Hanys, constitute *external, violent and accidental means* within the meaning of that phrase as written in the policy.

*Second.* Whether the proof in this case was sufficient to authorize the jury, if the case had been submitted to them, to find that the death of the assured was caused by *external, violent and accidental means,* producing death within ninety days from its infliction.

Before the plaintiff can recover in this action he must by proof establish both these propositions, by evidence, either direct or circumstantial, such as would sustain the verdict of the jury if they found in his favor. The uncontradicted evidence in this case is that " the cause of death was the infliction upon a portion of the body of a putrid animal substance, which worked through the system, causing him to die from affections of the different internal organs of the body. * * * The name of the manifestation of that infliction is known in medicine as malignant pustule; it is produced invariably by the infliction of animal substance upon the body." After a period of time, varying in different cases, there appears a viscular blister-like affair, a pustule. " It can only come from one single cause, because it is a specific thing, as much as the venom of a rattle-snake bite or hydrophobia. I am prepared to say that this was caused by the application of this virus; as to the method in which that charbon virus became implanted upon the man's lips I can't say. * * * It starts with a little bite or blister which becomes a pimple, a pustule, and it rapidly becomes mortified, cankerous, that is what we call malignant pustule." The evidence further shows that there were external indications upon the person of young Oaks of this nature; that the result was blood poisoning, that it was not produced by any other than external causes. From this evidence the jury would have been authorized to have found that this injury which resulted in the death of the assured was produced by external and accidental means. Could they also have found under this evidence that these means were violent within the fair meaning of the certificate ? Violent, in its ordinary acceptation of the term, means not natural or spontaneous, not intentional, voluntary, expected or usual. The degree of force is not always material. In this view of the case the bite of a fly or spider, or the sting of a bee may be as well characterized as violent as the bite of a rattlesnake or the sting of a scorpion. It is not quite clear that the parties to this contract on either side, in making and accepting this certificate, intended to embrace this kind of violence, as a condition creating a

liability under this policy, but it is a familiar rule of construction that, unless the instrument clearly express to the contrary, words are to be construed in their ordinary sense; and applying this rule of construction to the evidence in this case, we do not see why the cause of death was not from *external, violent and accidental means;* and we think the following cases substantially sustain this view: In *Muspear* v. *Accident Insurance Company* (42 L. T. N. S. Exch. Div., p. 900) the policy was substantially like this in suit. The death was caused by assured falling in the water in a fit of epilepsy and drowning. It was held that it was a personal injury caused by accidental, external, visible means, within the intent of the policy, and that a recovery could be had. (See comments in 22 Albany Law Journal, 223, 224.) In *Insurance Company* v. *Burroughs* (69 Penn. St., 43) the court says if the injury be accidental, and the result of it is death, what matters it whether the injury is caused by a blow with a pitchfork or a strain in handling it? And they define an accident as an event that takes place without one's foresight or expectation, an event which proceeds from an unknown cause or the unusual effect of a known and, therefore, not expected chance, casualty or contingency happening by chance or unexpectedly taking place, not according to the usual course of things, casual, fortuitous. (*Insurance Co.* v. *Burroughs*, 69 Penn., 43.) In *Mallory* v. *The Travelers' Insurance Company* (47 N. Y., 53), it was held, that when the assured was found dead in a pond with a bruise upon his head, that the jury might infer that if the wound did not produce death, but caused him to fall in the water where he was drowned, that the death was produced by accident, within the terms of an accident policy, and this rule is not changed by the decision of the Court of Appeals in *Searles* v. *Manhattan Elevated Railroad Company* (101 N. Y., 661). The injury resulting either from the wound or drowning would be from external accidental means. So in the case at bar, if we are to credit the undisputed evidence of Dr. Hanes, the injury was from accidental, external, violent means, within the definitions of those words, given above in the cases cited. If right in the above conclusion, the next inquiry is, would the proof offered justify the jury in finding that the death of the assured, if produced by the causes above discussed, justify a finding that those causes produced the death of the assured

within ninety days of the infliction of the injury. Upon this subject there is no direct proof, but the plaintiff insists that the proof that this attack is usual in localities where cattle are numerous and where raw hides are habitually handled, and that the deceased was engaged in the butchering business in Council Bluffs, and also in the freight office where hides are shipped extensively; and that he was in that exposed locality only from the 1st of February, 1884, to the twenty-first of March, of the same year, was sufficient evidence to go to the jury upon the question of the time when the injury which resulted in death was inflicted; and that the jury would have been authorized, from that evidence, to have found that ninety days had not elapsed from the time of the injury to the death. We are of the opinion that if that question had been submitted to the jury and from it they had found for the plaintiff, their verdict could not have been set aside as not supported by the evidence.

On the whole case, we think that there was enough evidence to authorize its submission as questions of fact to the jury, and that it was error for the court to take the case from them, and direct a verdict, and for that reason the judgment should be set aside, and a new trial ordered, costs to abide the event.

*Judgment reversed, new trial granted, costs to abide event.*